## OKLAHOMA *v.* TEXAS; UNITED STATES, INTERVENOR.

### IN EQUITY.

No. 6, Original. Argued November 25, 1925.—Decided October 11, 1926.

1. The effect of a decree as an adjudication conclusive upon the parties, is not to be determined by isolated passages in the opinion considering the rights of the parties, but upon an examination of the issues made and intended to be submitted, and which it was intended to decide. P. 42.

2. In the "Greer County Case," (*United States v. Texas,* 162 U. S. 1), it was conclusively determined that the boundary line between Texas and the territories of the United States followed the line of the true 100th meridian from its intersection with the South Fork of Red River, but the precise location of the meridian line was left open. P. 39.

3. A boundary line between two governments which has been run out, located and marked upon the earth, and afterwards recognized and acquiesced in by them for a long course of years, is conclusive, even if it be ascertained that it varies somewhat from the correct course; the line so established taking effect, in such case, as a definition of the true and ancient boundary. P. 44.

4. Upon the facts, it is found that the "Jones, Brown and Clark Line," run in 1859 and 1860 as a location of the 100th meridian between the south bank of the Red River and the parallel of thirty-six degrees thirty minutes north latitude, and claimed by Oklahoma to be the boundary between that State and Texas, has not been accepted and acquiesced in as the established boundary by the United States, Texas, or Oklahoma. P. 44.

5. *Quaere*, Whether twenty-four years' acquiescence by one State in the possession of territory under claim of right, and in the exercise of dominion and sovereignty over it, by another State, is sufficient in time to found a prescriptive right in the latter. P. 47.

6. The fact that the Territory and the State of Oklahoma in succession have continuously for twenty-four years enforced their civil and criminal laws over the area in dispute, does not establish the State's claim to it by prescription, in view of the fact that even during that period assertion of a claim of right (by the United States when Oklahoma was a territory,) on the one hand, and acquiescence therein (by Texas,) upon the other, were not continuous. P. 47.

7. Where, prior to the admission of Oklahoma to statehood, a federal surveyor, pursuant to an Act of Congress, attempted to locate the true intersection of the 100th meridian with the South Fork of the Red River, and marked the location by a monument, and this was approved by the Secretary of the Interior and adopted by Texas, but not by Congress, as marking the corner in the boundary, *held* that the facts did not sustain the claim of Texas that the boundary was thus established by acquiescence, as a line to be run north from the monument. P. 48.

8. The boundary between Oklahoma and the Panhandle of Texas is the line of the true 100th meridian extending north from its intersection with the south bank of the South Fork of Red River to its intersection with the parallel of thirty-six degrees and thirty minutes. P. 49.

Original suit brought by Oklahoma against Texas, to establish their boundary on the Red River. A number of opinions, orders, and decrees of the Court relative to that primary phase of the litigation have already been reported. The present opinion deals with another portion of the boundary which was brought into the case by the counterclaim of Texas. See 269 U. S. 314, 539, and other references in the opinion.

*Messrs. Thomas W. Gregory* and *R. H. Ward,* with whom *Messrs. C. W. Taylor, Orville Bullington, A. H. Carrigan, C. M. Cureton,* and *W. A. Keeling* were on the brief, for The State of Texas, on the counterclaim.

*Mr. S. P. Freeling,* with whom *Messrs. George F. Short* and *Edwin Dabney* were on the brief, for The State of Oklahoma.

*Mr. W. W. Dyar,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* and *Assistant Attorney General Parmenter* were on the brief, for the United States.

MR. JUSTICE SANFORD delivered the opinion of the Court.

· This suit was brought by the State of Oklahoma against the State of Texas, in 1919, to settle a controversy between them over that portion of their common boundary extending westwardly along the course of the Red River from the southeast corner of Oklahoma to the 100th meridian of longitude west from Greenwich. This portion of the boundary line, it has been decided, extends along the south bank of the River. 256 U. S. 70 and 608; 258 U. S. 574.

The present controversy arises under a counterclaim filed by the State of Texas, in 1920. It relates to that portion of the boundary line extending northwardly along the 100th meridian from the Red River to the parallel of 36 degrees 30 minutes north latitude, which constitutes the eastern boundary of the Panhandle of Texas and the main western boundary of Oklahoma. The only dispute is as to the location of this line upon the ground. Different surveys have been made. On the one side, Oklahoma and the United States claim that the line is that which was surveyed and marked in 1859 by A. H. Jones and H. M. C. Brown as the line of the 100th meridian,

and retraced and extended in 1860 by John H. Clark; and, on the other side, Texas claims that it is a more easterly line, running north from a monument established, by Arthur D. Kidder in 1902 to mark the intersection of the meridian and the Red River.

Three separate contentions are made:

1. Oklahoma and the United States contend that by the decision and decree of this court in *United States* v. *Texas*, 162 U. S. 1, commonly called the *Greer County* case, it was conclusively determined and decreed that the boundary line followed the line of the meridian as surveyed and marked on the ground by Jones, Brown and Clark, and the matter thereby became *res judicata*. 2. Oklahoma contends that, independently of this adjudication, the Jones, Brown and Clark line has been recognized as the true location of the meridian through a long course of years and is established as the boundary line by acquiescence and by long continued exercise of jurisdiction over the strip in dispute.  3. Texas on the other hand, contends that a line running north from the Kidder monument is the established boundary.

By the treaty of 1819 between the United States and Spain [1] the boundary line established between the two countries followed the course of the Red River westward to the 100th degree of west longitude, and, crossing the Red River, ran thence due north to the Arkansas River; all " as laid down in Melish's map of the United States." The same line was established by the treaty of 1828 between the United States and the United Mexican States,[2] and confirmed by the Convention of 1838 between the United States and the Republic of Texas;[3] and it became part of the boundary between the State of Texas and the adjacent territory of the United States on the ad-

---

[1] 8 Stat. 252.

[2] 8 Stat. 372.

[3] Treaties and Conventions of the United States, 1079.

mission of Texas into the Union in 1845.[4]  In 1850, however, by a legislative compact between the United States and the State of Texas, it was agreed that the northern boundary line of Texas should run west with the parallel of 36 degrees 30 minutes from its intersection with the 100th meridian;[5] so that we are not now concerned with the portion of the meridian extending north of that parallel.

Since 1850 many steps have been taken—at long intervals—looking to the establishment of the line of the meridian between the Red River and the parallel. To rightly understand the course of the legislation it should be borne in mind: first, that the Red River forks about sixty miles east of the strip of land now in dispute, the South Fork passing along its southern end, and the North Fork crossing it about forty miles to the north; and, secondly, that on Melish's map of the United States the 100th meridian was erroneously shown as crossing the Red River more than one hundred miles east of this strip, and east of the fork in the River.[6]  These two facts gave rise to a controversy in reference to the location of the other boundary line along the course of the Red River, which, although now long determined, was interwoven with the question as to the location of the line of the meridian north of the River and complicated the issues involved in its settlement.

In the light of this preliminary statement we proceed to set forth, in chronological order, the material facts[7] necessary to the determination of the contentions now made.

---

[4] Joint Res., 5 Stat. 797; Joint Res., 9 Stat. 108.

[5] 9 Stat. 446, c. 49; 2 Sayles' Early Laws of Texas, 267; President's Proclamation, 9 Stat. 1005.

[6] See copy of Melish's map, 162 U. S. 1, 52; also House Report No. 1595, 58th Cong., 2d sess., p. 2.

[7] These are shown, in the main, by an agreed statement of facts.

The first step towards the location of the boundary line was taken by the Texas Legislature, which in 1854 authorized the appointment of a commissioner, who, with a commissioner for the United States, should run and mark the entire boundary line between Texas and the territories of the United States from the point where it left the Red River to its intersection with the Rio Grande.[8]

Pending action by Congress in this matter, the United States, by a treaty made with the Choctaw and Chickasaw Indians in 1855,[9] awarded them a tract of land in the Indian territory whose western boundary was described as running north from the Red River along the 100th meridian to the main Canadian River. In 1857, the Commissioner of Indian Affairs, for the purpose of marking the boundaries of the Indian lands, employed two contract surveyors, A. H. Jones and H. M. C. Brown, to survey and mark the line of the meridian from the north bank of the main Red River to the north boundary of the Creek or Seminole country.

Before Jones and Brown had commenced this survey, Congress, in 1858, authorized the appointment of a joint commissioner to run and mark the boundary line between the Territories of the United States and Texas in accordance with the Texas Act of 1854.[10] The commissioners began their work on the Rio Grande, but differences soon arose, which caused them to separate; and the survey was continued solely by John H. Clark, the United States commissioner, who ran and marked a large part of the western boundary of Texas and its northern boundary along the parallel.[11]

---

[8] 3 Gammel's Laws of the State of Texas, 1525. And see prior Joint Resolution to the same effect, *Ib.*, 206.

[9] 11 Stat. 611.

[10] 11 Stat. 310, c. 92.

[11] Clark's reports appear in Sen. Ex. Doc. No. 70, 47th Cong., 1st sess.; and a summary in House Doc. No. 635, 57th Cong., 1st sess., p. 14.

Meanwhile Jones and Brown had made, in 1859, their survey of the boundary of the Indian lands. They began at a rock monument on the north bank of the South Fork of Red River, placed to mark the intersection of the 100th meridian with that stream, and ran the line of the meridian northwardly from this monument about 109 miles, marking it with mile posts.[12]

In February, 1860, the Texas Legislature—then claiming, it appears, that the boundary line along the Red River followed the line of the North Fork—created the County of Greer, with a boundary including, in general terms, all the territory lying east of the 100th meridian and between the North and South Forks of the River; this being a tract containing more than 2,000 square miles and extending about sixty miles east of the Jones and Brown line.[13]

Later in 1860, Clark, the United States commissioner, under instructions from the Secretary of the Interior, adopted and retraced so much of the line of the meridian as had been established by Jones and Brown, and prolonged their line to its intersection with the parallel, where he established an earth monument to mark the northeast corner of Texas.[14]

For many years after 1860 Texas asserted complete jurisdiction over the territory included in Greer County.[15]

---

[12] See report of Commissioner of the General Land Office, House Report No. 1282, 47th Cong., 1st sess.; and House Doc. No. 635, 57th Cong., 1st sess., p. 12. It appears that Jones and Brown adopted as the beginning of their survey the monument which had been erected earlier in the same year by Daniel G. Major, the astronomer for Indian boundary surveys.

[13] 2 Sayles' Early Laws of Texas, 490. This meridian was described in the Act as " the twenty-third degree of west longitude," this being the longitude from Washington. The tract is that marked on a map in 162 U. S. 1, 22, as "·Unassigned Land."

[14] See Clark's report, Sen. Ex. Doc. No. 70, 47th Cong., 1st sess., p. 300.

[15] See House Report No. 1595, 58th Cong., 2d sess., p. 3.

At different times from 1872 to 1875, four United States contract surveyors separately retraced different portions of the Jones, Brown, and Clark line of the 100th meridian and re-established most of it by rebuilding many of the mile posts. They also, at the same times, subdivided the public lands in the western part of the Indian Territory in a series of townships closing on the west upon the line thus retraced and re-established, on which they erected the closing corners of the townships.[16]

In 1876 the Texas Legislature established a series of five new counties lying west of the Jones, Brown and Clark line and extending southwardly from the parallel beyond the South Fork of Red River. Their eastern line commenced " at a monument on the intersection of the one hundredth meridian " and the parallel, and called for five " mile posts on the one hundredth meridian " and " the initial monument on the one hundredth meridian." One of these counties and parts of two others lay between the North and South Forks of Red River, and two of these " mile posts " and the " initial monument " were between the two Forks, that is, between these counties and Greer County.[17]

In 1879 Congress passed an Act creating the northern judicial district of the State of Texas, in which Greer County was included.[18]

In January, 1882, the Secretary of the Interior, in response to a Resolution of the Senate calling for a report of any survey made by the United States and Texas Boundary Commission under the Act of 1858, trans-

---

[16] See report of Arthur D. Kidder, special examiner of surveys, House Report No. 1186, 59th Cong., 1st sess., p. 8, and the Field Notes and Plats of the Indian Territory to which he refers; *Id.*, 45 Cong. Rec. 6109.

[17] Sayles' Early Laws of Texas, 505. The lines of these counties are given in 162 U. S. 1, 40, note 1, and their location is shown on the map at p. 22.

[18] 20 Stat. 318, c. 97.

mitted a report of the Commissioner of the General Land Office in which, after setting forth the work that had been separately done by Clark in running the western and northern boundaries of Texas, the establishment of part of the line of the 100th meridian by Jones and Brown, and the retracing of their line by Clark, he specifically called attention to the fact that: " No part of said boundary survey has ever been officially agreed upon or accepted by the two governments as contemplated in the Act of Congress authorizing the survey." This report was referred to the Senate Committee on Territories.[19]

At this same session of Congress—a controversy having meanwhile arisen as to the ownership of the territory included in Greer County—a Representative from Texas introduced a bill to define the boundary between the Indian Territory and Texas as running up the middle of the North Fork of the Red River to the 100th meridian, and thence due north to " the northeast corner of said State of Texas as now established;"[20] while a Senator from Texas introduced a bill to create a joint commission to run and mark the boundary line along the course of the Red River westwardly to the 100th meridian, as laid down in Melish's map, and definitely settle which Fork was the principal or true Red River.[21]   And before the

---

[19] Sen. Ex. Doc. No. 70, 47th Cong., 1st sess.  Many years later, in 1906, the House Committee on the Judiciary again called attention to the fact that up to the date of this report of the Secretary of the Interior no part of the boundary " had ever been officially agreed upon or accepted by Texas or the United States, as contemplated in the Act" of 1858.   House Report No. 1186, 59th Cong., 1st sess., p. 3.

[20] H. R. 1715, 47th Cong., 1st sess.  This bill was reported upon adversely by the House Judiciary Committee, which recommended the creation of a joint commission to settle the facts involved in the Greer County controversy.   House Report No. 1282, 47th Cong., 1st sess.   This report appears in 162 U. S. 1, 69, note 1.

[21] S. 954, 47th Cong., 1st sess.  This bill passed the Senate.  13 Cong. Rec. 3027.

end of this session, the legislature of Texas, in May, 1882, passed an Act authorizing the appointment of a commissioner to run and mark, with a commissioner for the United States, the course of the Red River westwardly to the 100th degree of west longitude, as laid down on Melish's map, in order to settle the true location of the meridian and determine whether the North or South Fork was the true Red River designated in the treaty of 1819; and to establish a monument where the meridian crossed the River as a corner in the boundary.[22]

Congress took no final action in reference to any part of the boundary line at this session. In 1885, however, it passed an Act, reciting that a controversy existed between the United States and Texas as to the point where the 100th degree of longitude crossed the River, as described in the treaty, which had never been ascertained and fixed by any authority competent to bind the United States and Texas, and which should be settled so that the boundary then in dispute because of the difference of opinion as to this crossing might also be settled; and authorizing the President to designate officers who, in conjunction with such persons as might be appointed by Texas, should ascertain and mark the point where the 100th meridian crossed the Red River, in accordance with the terms of the treaty.[23]

In 1887 the President issued a proclamation reciting that the United States owned all of the territory lying between the 100th meridian and the North and South Forks of the Red River, but that the State of Texas had asserted a conflicting claim thereto growing out of a controversy as to the point where the meridian crossed the Red River, as described in the treaty of 1819, and that the United States commissioners appointed under the Act of 1885 had by their report determined that the·

---

[22] 9 Gammel's Laws of the State of Texas, 265.

[23] 23 Stat. 296, c. 47.

South Fork was the true Red River designated in the treaty, but the Texas commissioners had refused to concur in this report; and admonishing and warning the officers of Greer County and all other persons against exercising or attempting to exercise any authority over these lands.[24]

In 1890 Congress created the Territory of Oklahoma out of a portion of the Indian Territory bounded on the west and south by the boundary lines of the State of Texas;[25] and by the same Act directed that a suit in equity be brought in this Court on behalf of the United States against the State of Texas, to settle the controversy as to the title to the land included in Greer County lying east of the 100th meridian, and between the Forks of the Red River. The suit was instituted in the same year.

In 1891 the surveys made by Clark, the United States commissioner, under the Act of 1858, of the western and northern boundary lines of Texas, were "confirmed" by an Act of Congress[26] and by a Joint Resolution of the Texas Legislature;[27] but neither the Act nor the Resolution made any reference to the survey of the eastern boundary.

In 1892 H. S. Pritchett, Director of the Astronomical Observatory of Washington University, St. Louis, was employed by Texas to establish, scientifically and accurately, the intersection of the 100th meridian with the Red River. He located this intersection 3797.3 feet east of the Jones and Brown initial monument.[28]

In 1896 this Court decided the *Greer County* case, and entered a decree adjudging that the territory east of the

[24] 23 Stat. 843. The report of the United States commissioners appears in House Ex. Doc. No. 21, 50th Cong., 1st sess.

[25] 26 Stat. 81, 92, c. 182.

[26] 26 Stat. 948, 971, c. 542.

[27] 10 Gammel's Laws of the State of Texas, 195.

[28] His report appears in House Doc. No. 635 57th Cong., 1st sess., p. 31.

100th meridian of longitude between the North Fork of the Red River and the south bank of the South Fork, called Greer County, constituted no part of the territory belonging to Texas, but was subject to the exclusive jurisdiction of the United States. *United States* v. *Texas, supra,* 90.

In 1901 Congress passed a Act, in which, after reciting that this Court had adjudged in the *Greer County* case that " the degree of longitude one hundred west " designated in the treaty of 1819, "referred to the true one hundredth meridian astronomically located," and that "the true intersection of this meridian" with the South Fork of Red River had not been fixed by the United States and Texas, acting together, nor " by the decree in said cause," the Secretary of the Interior was directed to cause " the intersection of the true one hundredth meridian " with the South Fork of the River, to be established and fixed " by the most accurate and scientific methods," and a suitable monument to be erected at such intersection.[29]

Pursuant to this Act the Secretary of the Interior detailed Arthur D. Kidder, Examiner of Surveys, to establish the point of intersection of the true meridian with the River. He did this work in 1902, making his observations and calculations according to the scientific methods then in use; determined that the true meridian intersected the South Fork at a point 3699.7 feet east of the initial monument of Jones and Brown, and 97.6 feet west of Pritchett's location; and placed a sandstone monument on the north side of the stream to mark the point of intersection as thus determined. His report and field notes were approved by the Commissioner of the General Land Office and adopted by the Secretary of the Interior, who transmitted copies of them to the House of Representatives, and reported, in accordance therewith, that he had caused " the intersection of the true one

---

[29] 31 Stat. 731, c. 75.

hundredth meridian with the Red River" to be determined and established by a permanent monument in compliance with the Act of 1901.[30]

In March, 1903, Kidder, who meanwhile had been further detailed by the Secretary of the Interior, as astronomer and surveyor, to establish and mark upon the ground the point of intersection of the 100th meridian with the parallel of 36 degrees 30 minutes, and three other astronomical points in the boundary of Texas, was directed by the Commissioner of the General Land Office to establish these standard reference points, and also to " ascertain the condition of the old boundary lines, the amount of error in the original surveys and . . . the changes which a true determination would involve," and specifically, to " make a careful retracement of the 100th meridian as closed upon in the survey of public lands in Oklahoma from the Red River north to the parallel."

Before Kidder had completed this supplemental work, the Texas Legislature in April, 1903, authorized the appointment of a commissioner to run and mark with a commissioner for the United States, the boundary lines between Texas and the Territories of Oklahoma and New Mexico.[31] This Act recited that Kidder had duly fixed a monument at the intersection of the true 100th meridian with the Red River, as provided by the Act of Congress of 1901, which properly marked the boundary, and required a re-survey of the lines between Texas and Oklahoma; and directed that the monument established by Kidder as the point of intersection should " be accepted as correct."

Kidder completed his supplemental work on the boundary line in 1903, and made a detailed report to the Secretary of the Interior in April, 1904, which was trans-

---

[30] House Doc. No. 33, 57th Cong., 2d sess.; *Id.*, 45 Cong. Rec. 6105. Field notes, House Doc. No. 375, 57th Cong., 2d sess.

[31] Texas General Laws, 1st Call. Sess., 1903, p. 12.

23468°—27——3

mitted to the House of Representatives in December, 1905.[32] The portion of this report dealing with the 100th meridian shows that he retraced the entire Jones, Brown, and Clark line, as it had been re-established and closed upon by the various contract surveyors between 1872 and 1875, and found that, beginning at the initial monument of Jones and Brown on the bank of the South Fork of Red River, it deflected gradually to the east, and intersected the line of the parallel 743.16 feet west of the line of the 100th meridian extended north through the monument which he had previously placed on the South Fork. He found no evidence of the monument established by Clark in 1860 to mark this intersection. At the easterly point which Kidder determined to be the intersection of the parallel and the true meridian he placed a concrete and iron monument, but he did not mark the intervening line of the meridian. He also found that since the execution of the surveys closing upon the Jones, Brown and Clark line, the United States had patented and disposed of public lands on the east, and that Texas had apparently closed its surveys on the same line for a large part of the distance.

In December, 1904, the Secretary of the Interior transmitted to the House of Representatives, the draft of a bill submitted by the Commissioner of the General Land Office to provide for the re-survey and re-establishment of portions of the boundary lines between Texas and the Territories of New Mexico and Oklahoma, including the line of the 100th meridian from the Red River to the parallel of 36 degrees 30 minutes. This was accompanied by a letter from the Commissioner, in which he stated that large errors had been discovered in the location of the 100th and 103rd meridians, and that the agitation concerning questions of jurisdiction which had been prolific

---

[32] House Doc. No. 259, 59th Cong., 1st sess., with diagram; *Id.*, House Report No. 1186, 59th Cong., 1st sess., and 45th Cong. Rec. 6108

on account of these incorrect locations, could only be ended by the establishment of lines upon the ground in the locations where they were designed to be when these meridians were named as the boundaries of Texas. These were referred to the House Committee on Public Lands.[33]

In 1905 and 1906 a Representative from Texas introduced in the House of Representatives two bills and a joint resolution to provide for the running and marking of the boundary line between Texas and the Territories of the United States, in substantially the same terms as the Texas Act of 1903; except that, while accepting as correct Kidder's location of the intersection of the true 100th meridian with the Red River, they directed that the line be run north to the intersection of the meridian with the parallel of 36 degrees 30 minutes as determined by Clark, the United States commissioner, in 1859.[34] These bills were recommended for passage by the House Committees on the Judiciary and on Indian Affairs, respectively, but no further action was had in reference to them.[35]

Again, in October, 1907, the Secretary of the Interior wrote a letter to the House of Representatives recommending the adoption of a Joint Resolution, a draft of which he enclosed, for the appointment of commissioners to establish the boundary between Texas and the Territories of the United States, substantially in accordance with the Texas Act of 1903, and likewise providing that the monument established by Kidder as the point of intersection of the true 100th meridian should "be accepted as correct." In this letter, after calling attention to the fact that no action had been taken by Congress in this matter, he said: "The adjustment of these lines is of

---

[33] House Doc. No. 38, 58th Cong., 3d sess.

[34] Bill, H. R. 443, 59th Cong., 1st sess.; House Joint Res. No. 66, 59th Cong., 1st sess.; Bill, H. R. 15098, 59th Cong., 1st sess.

[35] House Report No. 1186, 59th Cong., 1st sess.; House Report No. 1788, 59th Cong., 1st sess.

great interest to the department, because they involve
both public lands and lands of the Choctaw Indians, and
until they are adjusted present problems and embarrass-
ments which cannot be solved or removed until the lines
are definitely fixed and marked. The continued unsettled
condition of these boundary lines adds to the problems
and involves the Government, settlers on the public
lands, and citizens of the Indian tribes and of the State
of Texas in trouble and expense  .  .  .  of which they
should be relieved at the earliest possible moment." This
letter and resolution was referred to the House Judiciary
Committee.[36]

In November, 1907, Oklahoma was admitted as a State
of the Union.[37]

In 1910 the House Committee on Indian Affairs recom-
mended for passage another Joint Resolution introduced
by the Representative from Texas for the creation of a
commission to establish and mark the boundary lines
between Texas and the Territories of the United States,
corresponding to the Joint Resolution which had been
recommended by the Secretary of the Interior in 1907,[38]
but no further action was taken by Congress in reference
to the matter.

In 1910 also, one John L. Wortham filed applications
with the surveyors of the five counties that had been
created in 1876, under the provisions of the Texas Acts
authorizing the sale of vacant land, for the purchase from
the State of the land on the east of these counties lying
in the strip now in dispute, between the Jones, Brown
and Clark line and Kidder's location of the 100th me-
ridian, which had not been previously embraced in the
land surveys of these counties. One of these surveyors

---

[36] House Doc. No. 54, 60th Cong., 1st sess.

[37] President's Proclamation, 35 Stat. 2160.

[38] House Joint Res. No. 6, 61st Cong., 2d sess.; House Report No.
1250, 61st Cong., 2d sess.

having refused to make a survey for the purpose of obtaining a grant, it was held by the Texas Court of Civil Appeals, in 1912, that mandamus would not lie to compel him so to do, on the ground, substantially, that as the undisputed facts show that the State of Texas was not exercising jurisdiction over this land, it was not the duty of the county surveyor to survey lands which the political powers of the State recognized as lying beyond its limits, and the court had no jurisdiction to determine whether the *de facto* boundary line was the *de jure* boundary of the State, this being a political and not a judicial question. *Wortham* v. *Sullivan,* 147 S. W. 702. On the other hand, however, surveys having been made by other county surveyors and the applications returned to the General Land Office of Texas, three patents were issued to Wortham by the State of Texas later in the same year covering 2002 acres of the strip of land in dispute; this being the only part of this strip which Texas has ever attempted to patent. Since that time, it is stipulated, the award to Wortham of other lands in this strip has been held in abeyance "on account of the shadow of doubt cast upon the legal status of the aforesaid Kidder line," but "the General Land Office of Texas has in no sense abandoned its claim to the area west of and adjacent to " that line.

In 1919 the Texas Legislature passed an Act reciting the existence of a controversy between Texas and Oklahoma, and possibly the United States and certain Indian tribes, concerning the boundaries between the two States, and directed that a suit be instituted in this Court for the purpose of determining and settling these boundaries.[39] But before this suit had been commenced the State of Oklahoma brought its suit in the present cause, in which, as has been stated, the State of Texas set up by counter-

---

[39] Concurrent Resolution, 2d Call. Sess., General Laws of Texas, 1919, p. 462.

claim its contention in respect to the location of the 100th meridian.

In 1923 the United States Coast and Geodetic Survey undertook to locate the portion of the 100th meridian in controversy by a modern and scientific method of triangulation, and concluded that the true meridian ran 371.5 feet east of the Kidder monument.

In addition to the foregoing matters the parties have stipulated that " the United States, the Territory of Oklahoma and the State of Oklahoma in succession have continuously enforced their laws, civil and criminal over the strip here in dispute ever since the decision in the Greer County Case."

It further appears that prior to May 3, 1920, the United States had disposed of 20,657 acres in the strip in dispute by patents issued on homestead entries and public sales, for which it had collected $8,026; that 3118 acres had been included in the school and university grants to Oklahoma; and that there were then 318 acres in pending entries, leaving, it was estimated, 118 acres of vacant land. The dates of these patents and grants are not shown.

We come now to the consideration of the several contentions made by the parties.

In the first place it is to be observed that while the intersection of the line of the 100th meridian and the South Fork of Red River has been located four times, that is, by Jones and Brown in 1859, by Pritchett in 1892, by Kidder in 1902, and by the Coast and Geodetic Survey in 1923—the three latter locations differing between themselves by less than 400 feet—there is no extrinsic evidence showing that any one of these locations is precisely correct. Nor is this claimed. And we have now no occasion to settle the exact location of the meridian line, as an original matter; the present contentions, as stated at the outset, being, on the one side, that the Jones, Brown and Clark line is conclusively established as the boundary by

the decision and decree in the *Greer County* case, and, also, independently of that adjudication, by long continued recognition, acquiescence, and the exercise of jurisdiction, and on the other side, that a line running north from the Kidder monument is the established boundary. We take up these contentions in their order.

1. The *Greer County* suit was brought by the United States against Texas solely to settle the controversy as to the land in " Greer County " lying east of the 100th meridian and between the Forks of the Red River. It did not involve any part of the boundary north of the River. Nor did it involve, under the issues submitted, the precise location of the meridian between the two Forks, but merely the general questions whether under the treaty of 1819 the boundary line along the course of the Red River followed the North or South Fork, or either of them, to the true meridian.

On the hearing, as appears from the opinion, the United States contended that under the treaty of 1819 the boundary line following the course of the Red River westward to the 100th meridian, went along and up the South Fork, as the continuation or principal fork c the River (p. 34). Texas, on the other hand, contended: 1st, that as the treaty declared that the boundary line should be as laid down on Melish's map, which located the 100th meridian east of the forks, thereby throwing the entire area in dispute west of the meridian, it was immaterial whether this location of the meridian on the map, being conclusive upon both governments, was astronomically correct or not, or whether the one or the other fork was the continuation of the main river; and 2nd, in the alternative, that even if the treaty referred to the true meridian, the course of the River followed the North Fork, and not the South (pp. 34, 35).

The court first concluded that, upon a reasonable interpretation of its provisions, the treaty merely took

Melish's map as the general basis for the adjustment of
the boundaries, and left open to subsequent determina-
tion and exact designation the precise location of the true
100th meridian (pp. 38, 42).  Independently, however, of
this interpretation of the treaty, it was added, as being,
perhaps, a stronger view, and equally conclusive, that
the official acts of the general government and of Texas
required that the controversy should be determined upon
the basis that the treaty line was intended to extend to
the true or actual meridian, and not to stop at the Melish
location (pp. 38, 42).  In developing this view the court,
after concluding and emphasizing that the legislative com-
pact of 1850 between the United States and Texas ac-
cepted the true 100th meridian as the boundary line, and
discarded the Melish location, said further that the precise
location of the meridian had not been left in doubt by the
two governments; that the United States had erected a
monument at the point where it intersected the parallel
of 36 degrees 30 minutes, and Texas had by its legislation
often recognized the true meridian to be as located by the
United States; that the two governments had, by official
action, declared that the meridian was located on the line
marking the eastern boundary of four of the counties
established by Texas in 1876; that the proof left no room
to doubt that the true meridian was "immediately east of
those counties"; and that the acts of the two governments
and the evidence, therefore, concurred in showing that the
meridian was "not correctly delineated on the Melish
map" (pp. 39–41).  The final conclusion on this question
was that, independently of the treaty itself, it must be
held that the legislative compact of 1850, together with
the subsequent acts of the two governments, required that
the meridian "be taken to be the true 100th meridian,"
and, consequently, that the course of the Red River west-
ward "must go, and was intended to go to the true or
actual 100th meridian, and not stop at the Melish 100th

meridian." (p. 42.) Taking up then the remaining question whether, as the United States contended, the line following the course of the Red River westward met the 100th meridian at the point where the South Fork of the River crossed the meridian, or whether, as Texas contended, it ran up the North Fork northwestwardly until it crossed the meridian, the court, after a detailed consideration of the evidence, concluded that the South Fork more nearly met the requirements of the treaty, and was to be followed as the boundary line to its intersection with the true meridian (pp. 42, *et seq.*) There was, however, no statement in the opinion either that this point of intersection was fixed at the Jones and Brown initial monument, or that Jones, Brown and Clark had correctly located the line of the meridian.

For the reasons stated in the opinion, the court entered a decree—set out at the end of the opinion itself—by which it was " ordered, adjudged and decreed that the territory east of the 100th meridian of longitude, west and south of the river now known as the North Fork of Red River, and north of a line following westward, as prescribed by the treaty of 1819 between the United States and Spain, the course, and along the south bank, both of Red River and of the river now known as the Prairie Dog Town Fork or South Fork of Red River until such line meets the 100th meridian of longitude—which territory is sometimes called Greer County—constitutes no part of the territory properly included within or rightfully belonging to Texas at the time of the admission of that State into the Union, and is not within the limits nor under the jurisdiction of that State, but is subject to the exclusive jurisdiction of the United States of America." (p. 90.)

We are of opinion that the decision in that case is not conclusive upon the parties as an adjudication that the boundary line between Texas and the Territories of the

United States followed the line of the 100th meridian as surveyed and marked by Jones, Brown and Clark. The sole questions, under the issues submitted, were whether .the erroneous location of the meridian on Melish's map was controlling, and, if not, whether the boundary line followed the North or South Fork to the intersection with the true meridian. No issue was submitted as to whether, if the South Fork were to be followed, the Jones, Brown and Clark line was to be taken as establishing the exact location of the true meridian and fixing the western boundary of the tract in dispute. And while it was said in the opinion, *arguendo,* in disposing of the first issue, that Texas had recognized the true meridian to be as located by the United States, and the two governments had declared, by official action, that it was located on the line marking the eastern boundary of four of the counties established by Texas in 1876, the proof leaving no doubt that the true meridian was immediately east of these counties—this was said, not as a determination of the exact location of the true meridian for the purpose of a precise adjudication, but merely as one of the reasons leading to the general conclusion that under the treaty of 1819 the boundary was intended.to follow, as the parties had recognized, the line of the true meridian and not the location laid down on Melish's map. This is emphasized and made clear by the terms of the decree, which merely adjudged, in general terms, that the land lying east of the meridian and between the two forks was not the property of Texas, but within the exclusive jurisdiction of the United States; and neither adjudged that the true meridian followed the Jones, Brown and Clark line nor otherwise fixed its precise location.

The effect of a decree as an adjudication conclusive upon the parties, is not to be determined by isolated passages in the opinion considering the rights of the parties, but upon an examination of the issues made and intended

to be submitted, and which it was intended to decide. *Vicksburg* v. *Henson*, 231 U. S. 259, 272, 273; *United Shoe Mach. Co.* v. *United States,* 258 U. S. 451, 460.

Thus tested, the effect of the decree in so far as it related to the western boundary of the tract in dispute, was merely that it followed the line of the true meridian. In other words, the location of the boundary along the true meridian was left in the same situation under the decree as that of the south bank of Red River and of the South Fork. Each was declared in general terms to be the boundary; but the precise location of neither was adjudged. It was later held by this Court that, while so much of this decree as adjudged that the boundary between the territories of the United States and Texas followed the south bank of Red River and of the South Fork was *res judicata* and conclusive upon the parties, *Oklahoma* v. *Texas,* 256 U. S. 70, 93, it still needed to be determined what constituted the south bank of the river and where along that bank the true boundary line was to be located. *Oklahoma* v. *Texas,* 256 U. S. 602, 608. And so, while the decree likewise conclusively determined that the boundary line between Texas and the territories of the United States followed the line of the true 100th meridian from its intersection with the South Fork of Red River, it was, for like reason, not an adjudication as to the precise location of the meridian line, but left this matter open and undetermined.

This was clearly recognized by the Act of Congress of 1901, which recited, not only that it had been adjudged by this Court that the treaty of 1819 " referred to the true one hundredth meridian astronomically located," but that " the true intersection of this meridian " with the South Fork of Red River had not been fixed either by the United States and Texas, acting together, or by the decree; and directed the Secretary of the Interior to cause the " intersection of the true meridian " with the

South Fork to be established. And the recognition of the fact that the precise location of the boundary line along the meridian had not been definitely determined nor settled, was the basis not only of the subsequent recommendations of the Secretary of the Interior for the settlement of the boundary, but of the reports of the House committees recommending legislation for running and marking the line.

2. The contentions that the Jones, Brown and Clark line has been recognized and adopted as the location of the 100th meridian for a long course of years and is established as the boundary by acquiescence and the exercise of jurisdiction, are made by Oklahoma alone, and not by the United States.

It is well settled that governments, as well as private persons, are bound by the practical line that has been recognized and adopted as their boundary, *Missouri* v. *Iowa,* 7 How. 660, 670; *New Mexico* v. *Colorado,* 267 U. S. 30, 40; and that a boundary line between two governments which has been run out, located and marked upon the earth, and afterwards recognized and acquiesced in by them for a long course of years, is conclusive, even if it be ascertained that it varies somewhat from the correct course; the line so established taking effect, in such case, as a definition of the true and ancient boundary. *Virginia* v. *Tennessee,* 148 U. S. 503, 522; *Maryland* v. *West Virginia,* 217 U. S. 1, 42; *New Mexico* v. *Colorado, supra,* 40. We find, however, upon the facts, that the Jones, Brown and Clark line has not been established as the boundary line by any such long continued recognition and acquiescence.

The original Jones and Brown line was not run for the purpose of marking the boundary between Texas and the Territories of the United States under any authority from Congress, but was located under the direction of the Commissioner of Indian Affairs merely to mark the

boundary of certain Indian lands. The retracement and re-establishment of this line, as it had been extended by Clark in 1860, and the subdivision of the public lands into townships closing on it, between 1872 and 1875, was merely the action of the Land Department. Congress itself did not in any manner recognize this line as constituting the boundary of Texas.

And although the Texas Legislature in 1876 established five new counties in which the calls for monuments and mile posts on " the one-hundredth meridian " evidently referred to the Jones, Brown and Clark line, it is apparent that these calls were inserted merely as a description of the boundaries of the new counties and not as a recognition of this line as constituting the eastern boundary of the State itself, since one of these monuments and two of these mile posts were within the forks of the Red River and between three of these new counties and " Greer County," which the Legislature had created sixteen years before, and over which Texas was continuing to assert jurisdiction. In 1882, the report of the Secretary of the Interior called attention to the fact that no part of the boundary survey had ever been officially agreed upon or accepted by the two governments as contemplated by the Act of Congress. In the same year the Texas Legislature asserted that it was necessary to run and mark the course of the Red River to the 100th meridian, as laid down on Melish's map, in order to settle the true location of the meridian and determine whether the north or south fork was the true Red River, and that a monument should be established where the meridian crossed the River as a corner in the boundary. In 1885 Congress declared that the point where the 100th meridian crossed the River, as described in the treaty, had never been ascertained and fixed by any authority competent to bind the United States and Texas, and that the existing controversy and the boundary then in dispute because of a difference of

opinion as to this crossing should be settled. In 1891, although the surveys made by Clark, under the Act of 1858, of the western and northern boundary lines of Texas, were "confirmed" both by Congress and by the Texas Legislature, neither confirmed his survey of the eastern boundary line. In 1892 Texas separately employed Pritchett to establish the intersection of the meridian with the River. In 1901, after it had been settled by the decision in the *Greer County* case that the boundary line followed the South Fork of the River to its intersection with the true meridian, Congress declared that the true intersection of this meridian with the South Fork had not been fixed and directed that it be established and a monument erected. This was done by Kidder in 1902, and reported by the Secretary of the Interior as a determination and establishment of the true intersection. The Texas Legislature in 1903 declared that Kidder had duly fixed the intersection of the true meridian with the River, and that his monument properly marked the boundary and should be "accepted as correct." And from that time to the filing of its counterclaim in 1920 Texas never abandoned this contention, or recognized in any manner the Jones, Brown and Clark line as the boundary; while, on the other hand, the Secretary of the Interior not only approved Kidder's location of the true intersection, but in 1907 recommended that it be "accepted as correct" in establishing the boundary. And finally, in 1919, the Texas Legislature specifically asserted the existence of a controversy concerning the boundary line.

These facts, in our opinion, demonstrate that from the running of the Jones, Brown and Clark line in 1859 and 1860 to the filing of the counterclaim by Texas in 1920, there was no period of time, either before or after the decision in the *Greer County* case, in which Texas and the United States or the State of Oklahoma, recognized and aquiesced in the Jones, Brown and Clark line as the estab-

lished boundary, and fall far short of showing its practical adoption. On the contrary, the course of the legislation, on both sides, instead of treating the boundary as settled and acquiesced in, dealt with it as a matter requiring settlement. *Arkansas* v. *Tennessee,* 246 U. S. 158, 172.

Nor is the fact, as to which the parties have stipulated, that since the decision in the *Greer County* case the United States, and the Territory and State of Oklahoma in succession have continuously enforced their civil and criminal laws over the territory in dispute, sufficient to establish Oklahoma's claim to this territory by prescription. The general principle of public law that as between states long acquiescence in the possession of territory under a claim of right and in the exercise of dominion and sovereignty over it, is conclusive of the rightful authority, *Rhode Island* v. *Massachusetts,* 4 How. 591, 638, *Indiana* v. *Kentucky,* 136 U. S. 479, 510, *Virginia* v. *Tennessee, supra,* 522, *Louisiana* v. *Mississippi,* 202 U. S. 1, 53, *Maryland* v. *West Virginia,* 217 U. S. 1, 42—a principle by which prescription founded on length of time is regarded as establishing an incontestible right—does not apply here.

Without determining whether the period of twenty-four years which intervened between the decision in the *Greer County* case and the filing of the counterclaim, could under any circumstances be a sufficient foundation for a prescriptive right—this being a much shorter period than that involved in any of the cases cited—it suffices to say that even during this period there has been neither a continuous assertion of a claim of right on the one side, nor an acquiescence therein upon the other. Within five years after this decision, while the United States still had paramount jurisdiction as to the boundaries of the Territory of Oklahoma, Congress specifically declared that the true intersection of the meridian with the South Fork of the River, which had been adjudicated as a corner in the

boundary between Texas and the Territory, had not as yet been fixed—thereby disavowing the Jones and Brown initial monument as an established corner—and directed that the true intersection be established. Thereafter, Kidder having established this intersection, with the approval of the Secretary of the Interior, at a point about three-quarters of a mile east of the Jones and Brown monument, the Texas Legislature immediately asserted and has continued to assert that his monument correctly located the true intersection and properly marked the boundary. And, on the other hand, although Congress did not accept the Kidder monument as correct, it did not at any time assert any claim that the jurisdiction of the United States extended to the Jones, Brown and Clark line.

It is plain that, under these circumstances, essential elements necessary to the establishment of a prescriptive right by an exercise of jurisdiction acquiesced in for a long period of years, are lacking.

3. On the other hand we cannot sustain the contention made by Texas that a line running north from the Kidder monument is the recognized and established boundary. The Act of Congress of 1901, while recognizing, in effect, that the true intersection of the meridian with the South Fork of the River is a corner in the boundary, merely directed that this point be established and marked by a monument, and did not authorize the establishment of the boundary line running northwardly from this monument. Thereafter, despite the facts that Kidder's monument was approved by the Secretary of the Interior and reported by him as a determination of the true intersection; that the Texas Legislature accepted Kidder's monument as properly marking the boundary; that the Secretary of the Interior caused Kidder to ascertain and mark the point where the line of the meridian intersected the parallel of 36 degrees 30 minutes, and show the discrepancy

between the meridian and the Jones, Brown and Clark line; that the Secretary submitted drafts of two bills for the running and marking of the boundary line, one of which specifically provided that Kidder's monument should be accepted as correct; and that various other bills and resolutions were from time to time introduced in the House of Representatives for the same purpose, some of which were recommended for passage by the committees to which they were referred—Congress nevertheless took no further action as to this matter, and neither accepted Kidder's monument as the correct location of the intersection of the true meridian and the South Fork, nor provided for the establishment and marking of the boundary northwardly therefrom. It is entirely clear that under these circumstances the line running north from the Kidder monument—which has never been run or marked upon the ground—cannot be regarded as the established boundary acquiesced in and adopted by the parties.

4. On the entire case our conclusions therefore are: that neither the Jones, Brown and Clark line, nor a line running north from the Kidder monument has been established as the boundary line; that the boundary is the line of the true 100th meridian extending north from its intersection with the south bank of the South Fork of Red River to its intersection with the parallel of 36 degrees, 30 minutes; and that this line should now be accurately located and marked by a commissioner or commissioners appointed by the court, whose report shall be subject to its approval.

The parties may submit within thirty days the form of a decree to carry these conclusions into effect.

23468°—27——4