**CASWELL et al. v. FAULK et al.**

No. 2589.

Court of Civil Appeals of Texas. Beaumont.

July 24, 1936.

Rehearing Denied Oct. 7, 1936.

Howth, Adams & Hart, of Beaumont, for appellants.

Dies, Stephenson & Dies, of Orange, for appellees.

COMBS, Justice.

The appellants, George W. Caswell, et al., were defendants in the court below, and the appellees, J. W. Faulk, et al., were plaintiffs, and we will designate the parties as in the trial court.

This is a boundary case, the only question involved being the true location of the north boundary line of the B. B. B. & C. survey No. 84 in Orange county, it being agreed upon the trial that the plaintiffs are the owners of the Jacob Beaumont survey and that the defendants are the owners of the B. B. B. & C. survey, and that the north line of the B. B. B. & C. survey No. 84, the senior survey, wherever located on the ground, is the south boundary line of the Jacob Beaumont, a junior survey. In locating the north boundary line of the B. B. B & C. the only difficulty presented, and which forms the basis of this suit, is the true location on the ground of its northwest corner, the beginning point called for in its field notes. Its field notes call to begin in the east line of the John Montez survey at the most southerly corner of the Wm. Allen survey, which point, by the final call in the field notes, is fixed at 693 varas from the John Montez southeast corner. Plaintiffs contend that the most southerly corner of the Wm. Allen

is not in fact in the east line of the Montez at all; that the call for it in the field notes must, therefore, be disregarded and the beginning point established in the Montez east line 693 varas from its southeast corner. The defendants contend that the Wm. Allen most southerly corner is located in the east line of the Montez, but at a point 1224.4 varas from its southeast corner, and that the call for distance must be disregarded and the beginning point of the north boundary line of the B. B. B. & C. established at that point. The contentions of the parties can be best discussed from the following sketch:

The B. B. B. & C. survey was originally surveyed in 1861 and a corrected survey was made in 1864 by A. H. Reading. He made the survey for Colonel Franklin R. Floyd, the owner of the land certificate issued to the B. B. B. & C. Railroad Company for 640 acres of land. Reading surveyed the land in two tracts, the larger he computed to be 619 acres and the other 21 acres, making up the 640 acres called for by the certificate. The larger survey is labeled B. B. B. & C. 84 on the above sketch, and is referred to in the testimony as the Big 3 B. The smaller tract is located in a wedge shape and is located north of the

Field Notes of Big 3 B Survey.

"Beginning at the extreme south corner of a survey made for the heirs of William Allen. D. S. and on the east line of John Montez' survey, a stake for corner in Prairie Marsh. Thence due East 1200 varas, set stake for a corner in the edge of a boggy tidal overflowed marsh. Thence down the edge of said marsh 164 varas due south, set stake for corner. Thence due East 1444 varas to another stake for a corner in Prairie Marsh. Thence due south 1465 varas to the bank of the Neches River, set a stake for a corner 142 varas below the mouth of a marsh bayou. Thence meandered the bank of the river * * * (meanders omitted) to a cypress tree marked (X) thus, the same being the S. E. corner of John Montez' Survey. Thence on Montez' line N. 23½ W. 693 varas to the place of beginning."

John Montez and south of the Wm. Allen, the triangle being shown in heavier lines of the sketch above and labeled Little 3 B. The Wm. Allen was surveyed by O. H. Delano, August 23, 1838, and the John Montez was surveyed by Wm. Armstrong, February 2, 1846. The dates when the different surveys were made are shown on the sketch. The field notes of the Big 3 B are shown immediately below the sketch.

The trial was to the court, without a jury. A mass of testimony of surveyors and other witnesses, as well as documentary evidence, was submitted. Certain facts appear without dispute. The northwest corner of the Montez, lettered A on the sketch, its southeast corner, which is also the southwest corner of the Big 3 B, at point B, and the southeast corner of the Big 3 B, at point C, are established on the ground from natural land marks. These three corners are located on the bank of the Neches river, where there is a small bit of high ground not over 100 varas wide, with trees on it. Back of that narrow strip of high ground is marsh extending over the entire region involved in this suit, the limits of the marsh being shown on the sketch. The trial court found, and the evidence shows, we think without controversy, that none of the lines within that marsh region were actually run out on the ground by the original surveyors that is to say, that neither the east line of the John Montez, the north line of the B. B. B. & C., nor its east line, nor its west line, were actually surveyed, but were simply platted in by the surveyor. The entire region is an almost impenetrable marsh, covered by what is denominated floating turf, that is, a sort of marsh grass surface, covering quicksands and bog, and filled with allegator holes, so that it is difficult to penetrate it at any time, even on foot. The evidence shows that on several occasions while the surveyors were making their surveys in preparation for the trial of this case that different members of the surveying crew fell into these bogs and alligator holes and had to be pulled out by their companions. There are no trees in the region, and no natural objects called for in any of the field notes. So it seems probable that if the surveyors went on the ground at all they went no farther than the corners, which were established on the river bank, and that they simply stood on the bank and "cast a wishful eye," without any attempt to make a personal survey or inspection of the regions "where my possessions lie."

It was also shown, we think, that the William Allen was an office survey, not actually made on the ground at all. At any rate, we think it cannot be questioned that the surveyor Delano did not survey the southeast line and establish the most southerly corner, the one involved here, on the ground. The field notes of the Wm. Allen give as its last call to go from the most southerly corner north 61 degrees 30 minutes east 3,211 varas to the Stephenson southwest corner, the place of beginning. That point, the southwest corner of the John Stephenson, is on high ground just at the edge of the marsh region, and is fully identified on the ground at the point S shown on the sketch. Plaintiff's surveyor, Forrest Daniels, in order to determine whether the call would place the most southerly corner in the Montez east line, went to the southwest corner of the John Stephenson and, by reversing the call, measured 3,211 varas, the distance called for in the Allen field notes. He ascertained that such point is at the point X on the sketch, which is 580 varas short of the John Montez east line, if that line should be run on the course of N. 23½ W. called for in the Montez field notes, and it is still 240 varas short of the Montez line, if that line be established as agreed to by the parties on a course of north 18 degrees 22 minutes west, as shown on the sketch. So the trial court concluded that the proper way to establish the north boundary line of the Big 3 B was to disregard the call for the most southerly corner of the Wm. Allen for the beginning point and to begin it in the east line of the Montez at the point 693 varas north of its southeast corner, the distance called for in the Big 3 B field notes. As so established, the field notes of the Big 3 B are satisfied in every respect, with the exception of the call for the most southerly corner of the Wm. Allen. It gives the east line the exact distance called for; the north line has a total distance of 2,690 varas, an excess of only about 46 varas over the distance called for in its field notes. Its east line is 1487.38 varas, only about 22 varas in excess of the distance called for in its field notes. The acreage awarded the defendants under the decree is 699 acres, or 80 acres more than Reading's field notes and the patent called for, which the plaintiffs' surveyor attributes to Reading's error in meandering the Neches river.

Against the contention of the plaintiffs and the conclusion of the trial court that in

locating the north boundary line of the Big 3 B, that the beginning call for the most southerly corner of the Wm. Allen must be disregarded and the beginning point placed by its call for distance, 693 varas from the southeast corner of the John Montez survey, the defendants make a number of contentions, and we can best discuss the case by taking up at this point what we think are the principal contentions made by the defendants.

The defendants first challenge the trial court's finding that the most southerly corner of the Wm. Allen is not in the east line of the John Montez survey and insist that the true location of that corner is in the east line of the John Montez, but that same is located 1224.4 varas from its southeast corner, and, that being true, that the call for distance should be disregarded and the call for the most southerly corner of the Allen given controlling effect, thus fixing the beginning point as contended for by the defendants. The defendants would locate the most southerly corner of the Allen in this manner: Armstrong, who surveyed the John Montez in 1846, calls to begin at the recognized southeast corner of the Montez, "thence N. 23½ W. at 930 vas. to a post on the line of a survey made for Wm. Allen; thence west 1031 varas to a post on the bank of the river," etc., the recognized northwest corner of the Montez. On the trial it was agreed that the proper way to locate the northeast corner of the John Montez was to locate it by reversing the call from its northwest corner at the distance called for, 1,031 varas. That places it at the point R on the sketch. When Reading surveyed the two 3 B tracts, he apparently surveyed them at the same time, as the field notes for both are given in one report, the field notes of the larger tract being given first, followed by the field notes of the smaller tract. In the field notes of the Little 3 B Reading called to begin at the John Montez northwest or upper corner; "thence on Montez's line East 1031 vs. to his N. E. corner, on the south line of Wm. Allen's Survey 130 varas west of a corner of Allen's survey in marsh," etc. Now the defendants contend that Reading, the surveyor of the Big 3 B, actually surveyed the Little 3 B tract on the ground; that he actually located the Montez northeast corner in the south line of the Allen; that when he said that point was 130 varas from a corner of the Allen survey it is to be presumed that he knew where he was and knew the location

of the Allen corner and the number of varas to it. The defendants and their surveyors locate the most southerly corner of the Allen by assuming that the corner Reading referred to was at the distance called for and so, beginning at the northeast corner of the Montez, they survey the distance of 130 varas on the course called for in the Allen field notes. From that point they follow the call for course and distance in the Allen field notes, which is south 10 degrees west 237 varas, and according to defendants' surveyors that course and distance places the corner in the Montez east line at the point Y on the sketch.

We think the trial court properly rejected that method of locating the corner. It does not, in fact, locate the Allen corner by the calls in the Allen field notes at all, but is grounded upon the assumption that the subsequent surveyor, Reading, was correct when he said the northeast corner of the Montez was at a point 130 varas from a corner of the Wm. Allen. Such contention assumes that the corner of the Allen referred to was established and marked by Delano, the locator of the Allen, which we think would be contrary to the weight of the evidence, which indicates that he did not survey that line at all on the ground. Further, it assumes that Reading actually measured the distance to such corner and correctly stated it. The corner was in the marsh, and the testimony of the surveyor shows that surveyors of this marsh region at the time these locations were being originally made very probably did not go out into the marshes and make any measurements, but simply platted in the field notes from data obtained from the records. No material objects or marks were identified on the ground as being placed there or called for by the original surveyors. As against that method of location, it is shown that the beginning point of the Allen is the southwest corner of the John Stephenson survey, which it is admitted is marked and established on the ground at the point S on the sketch, and the last call in the Allen field notes that from its most southerly corner to the place of beginning calls to go "N. 61½ deg. east 3211 varas." The Stephenson corner is the closest known and recognized point of call from the most southerly corner of the Allen, according to its field notes. The Allen line approaching the corner from the opposite direction to the other corner we have referred to meanders the

marsh for a total distance of 6,367 varas. Therefore, the correct way of locating the most southerly corner of the Allen is to reverse the call from the admitted true location of the John Stephenson southwest corner and measure the distance called for, as was done by plaintiffs' surveyor,· Forrest Daniels, which fixes the true location of the most southerly corner of the Wm. Allen at the point X on the sketch. That point is 240 varas short of the John Montez east line, as established by the trial court, and more than 500 varas short of that line if it should be located on the ground in accordance with the calls for its course in the field notes.

◼ Defendants offered several witnesses who testified that the point contended for by them as the true location of the Allen most southerly corner has been marked and located on the ground by a post, stake, or other artificial object and recognized generally by people owning land in that vicinity as the true location of the Allen most southerly corner for a long period of years, one witness stating that it had been so located and recognized for 60 or 70 years. And so it is insisted that such general recognition establishes the true south corner of the Allen and the beginning point of the north line of the Big 3 B; and, further, that a corner was marked there and recognized as the Allen most southerly corner at the time Reading made his survey, and it is to be presumed that he knew where it was on the ground and intended to make such point the beginning point of the Big 3 B survey, and that his only mistake was in miscalculating the distance. To all such contentions we think it sufficient answer to say that on this record Reading's call for the most southerly corner of the Wm. Allen in the Montez east line would not fix the beginning point of the north boundary line of the Big 3 B survey even if it should be conceded that the point contended for by the defendants is the true location of the Allen corner. The rule which gives a field note· call for an adjoinder controlling effect over a call for distance is not absolute or conclusive, but is a mere evidentiary presumption which may be overcome by other facts or circumstances which indicate that the surveyor's call for the adjoinder was erroneous., Thus in State v. Sullivan, 92 S.W.(2d) 228, 232, Judge Smedley, speaking for the Commission of Appeals, said: "It is true that a surveyor is presumed to have gone to the corners and lines that his field notes call for, but it is also true that he is presumed to have run the lines of his survey on the courses and for the distances described in his field notes. A presumption arising from a call for adjoinder may, on account of the rule as to relative dignity of calls, be sufficient to overcome the presumption arising from a call for course or distance, when the variation in the course or the excess in the distance is not unreasonable and there is no other evidence than such not unreasonable variation or excessive distance tending to prove that the surveyor did not go to the adjoinder. But the presumption that the surveyor went to the corner or line called for may be, and we think is here, entirely overcome by facts in evidence proving that he did not go there." In that case the field note call was for 3,000 varas, and to effectuate the adjoinder called for would require extending the line 550 varas, and with reference to that, Judge Smedley said: "It is not reasonably to be assumed that he made a mistake of that magnitude in running his first line." In the case before us, to grant the defendants' contention, we would have to assume that the surveyor, Reading, made a mistake of 531.4 varas, that being the difference in the distance of 693 varas called for in Reading's field notes and the 1224.4 varas to the point contended for by the defendants. Moreover, in this case the surveyor, Reading, was locating a land certificate, which entitled the holder to appropriate only 640 acres of land. He located 21 acres of it in one tract and 619 acres in the other, for the obvious reason that he thought he could not place it all in one tract. The computations in the field notes returned to the General Land Office show that he made a mistake in meandering the Neches river and actually put 699 acres in the Big 3 B instead of 619. But his field notes evidenced the fact that he was giving controlling effect to the calls for courses and distances.

◼ Moreover, a call for course and distance from known and undisputed corners will be given controlling effect over a call for adjoinder, even though the adjoinder called for be marked on the ground, when, under. the facts of the particular case, such construction of the survey is most consistent with the intention to be derived from the entire description, the call for adjoinder being rejected as in-

serted by mistake. State v. Sullivan, supra, and authorities cited. In the case before us, giving effect to the field note calls for the distance of 693 varas from the admitted southeast corner of the John Montez survey as the beginning point of the north line of the Big 3 B satisfies almost exactly all the calls in the field notes, with the exception of the call for the most southerly corner of the Wm. Allen survey. While, to construct the survey by accepting the point contended for by the defendants as the beginning point of the north line will extend both the east and west lines of the Big 3 B more than 500 varas beyond the distances called for in the field notes, and if the most southerly corner of the Allen is to be located as it should be, by the call for course and distance in the Allen field notes, then an additional call for course and distance would have to be supplied in Reading's field notes.

We will notice but one other contention of the defendants, and that is to the effect that the evidence of their witnesses established that for a long number of years adjoining property owners have recognized the location of the north boundary line of the Big 3 B with the lines and corners of the other surveys involved as contended for by them and that such location of lines and corners have become thus fixed by common consent and recognition.

The fixing of lines by common consent and recognition of adjoining owners involves an element of estoppel and mere acquiescence alone is not sufficient. Hunter v. Malone, 49 Tex.Civ.App. 116, 108 S.W. 709; Daugherty v. Manning (Tex. Civ.App.) 221 S.W. 893; Campbell Banking Co. v. Hamilton (Tex.Civ.App.) 210 S.W. 621. Here the defendants have made no improvements on the land in controversy, nor, as we view the record, have they been misled in any manner to their injury. The entire tract of land involved is in an almost impenetrable marsh and not fit even for grazing purposes. And, except for the hope of an oil strike, which springs eternal in the breast of the gulf-coast land owner, it appears to have little, if any, value and to serve no useful purpose except to hold the world together. No improvements of any kind have been placed upon it. Moreover, the record shows that every affected survey has left in it more acreage than its patent calls for when the north line of the Big 3 B is fixed as established by the trial court.

True, the Beaumont survey, owned by the plaintiffs, will have considerably more acreage than its patent calls for, but that is a mere incident. The record shows, and it was so agreed upon the trial, that the only issue involved in this case is the true location of the north boundary line of the Big 3 B survey, and that the Beaumont survey, a junior survey which calls for the lines of the surrounding surveys, will take whatever land remains after the other surveys are located, whether that be more or less than called for in its patent.

Finding no error, the judgment of the trial court is in all things affirmed.