**SANSING et al. v. BRICKA et al.**

No. 5362.

Court of Civil Appeals of Texas. Amarillo.

Dec. 15, 1941.

Rehearing Denied Feb. 9, 1942.

Second Motion for Rehearing Denied March 2, 1942.

144

Riley Strickland, of Amarillo, and H. Grady Chandler, of Austin, for Roy Sansing.

E. C. Gray, of Higgins, Boyer & Archer, of Perryton, and Sanders & Scott, of Amarillo, for Ed Schneider and other parties.

Gerald C. Mann, Atty. Gen., of Texas, and Glenn R. Lewis, Asst. Atty. Gen. of Texas, for intervener State of Texas.

FOLLEY, Justice.

This suit is a title contest between Roy Sansing and the original claimants and occupants of eleven separate tracts of land in Lipscomb County, such land having been awarded to Sansing by the State Land Commissioner as vacant unsurveyed school land, and is situated in what is now known as Block S & S. The suit is a consolidation of eleven suits filed by the respective claimants and occupants against Roy Sansing, each involving a separate tract of land along the common northern boundary line of Lipscomb County and the Panhandle of Texas. The numbers of the eleven causes, the respective plaintiffs, the survey in Block S & S and the number of acres involved are as follows: (1) Cause No. 754, Henry Frass, Jr., Executor, Survey 11 of 658.7 acres; (2) 755, Henry Frass, Jr., Executor, Survey 16 of 34.5 acres; (3) 756, Henry Frass, Jr., Survey 15 of 85.7 acres; (4) 757, Milton S. Bricka, Survey 14 of 75.7 acres; (5) 758, Maggie Bricka, Survey 13 of 85.1 acres; (6) 759, Ella Haskins et al., Survey 33 of 84.2 acres; (7) 760, Charles E. Dennis, Survey 32 of 166.4 acres; (8) 761, W. P. Freeman, Survey 29 of 168.8 acres; (9) 762, Bertha L. Schwope et vir., Survey 27 of 89.6 acres; (10) 764, Ed Schneider, Survey 21 of 401.6 acres; and (11) 765, Mrs. John F. Meier et al., Survey 34 of 84.8 acres. All of these suits were consolidated in Cause No. 757.

In a trial before the court without a jury the trial court decided the question of vacancy in favor of Sansing but found that all the original claimants and occupants except Ed Schneider had perfected preference rights to purchase their respective lands. The judgment was for such claimants perfecting their preference rights for the title and possession of their lands but for Sansing as against Ed Schneider for the title and possession of the land in controversy between them and for rentals thereon. All parties excepted to the judgment and gave notice of appeal. Sansing is the appellant as against all the parties except Schneider. Schneider is appellant as against Sansing. All the original claimants assign and cross-assign error as against Sansing on the question of vacancy. In order to avoid confusion we shall give the parties their trial court designations.

The eleven tracts of land are contained in what is known in this record as Block S & S which is a narrow strip of land extending across the whole of the northern boundary of Lipscomb County and into Ochiltree County on the west of Lipscomb for about 2.4 miles. This block is bounded on the north by the Texas-Oklahoma state line and on the south by the north line of Block D of the W. P. Wiser Survey, which is also a narrow strip of land of equal length and almost of equal size with Block S & S and immediately south thereof. Block S & S is 501.63 varas wide at its east end which east line is in the original east line of Lipscomb County. At its west end in Ochiltree County Block S & S is 404.7 varas wide. Block D is 586.44 varas wide at each end. Immediately south of Block D is Block 10, H. T. & B. R. Co. Survey, the north line of which is common with the south line of Block D.

A map of the north portion of Lipscomb County and of the northeast corner of Ochiltree County is attached to this opinion to show Blocks S & S and D, the surveys in Block S & S in controversy herein and the north surveys of Block 10.

The lands involved in this suit are Surveys 11, 16, 15, 14, 13, 33, 32, 29, 27, 21 and 34 of Block S & S, totaling about 1935.1 acres. The other surveys in Block S & S are not in controversy in this suit. All of these eleven tracts except Survey 21 were recovered by the original claimants and occupants. Survey 21, consisting of 401.6 acres, was recovered by Sansing from Ed Schneider, the original claimant and occupant. The surveys of Block D begin numerically from the east side. Block D is divided into ten surveys of equal size each containing 640 acres. The surveys of Block S & S begin numerically from the west side and are thirty-four in number but of different sizes.

The plaintiff claimants and occupants of the lands in Block S & S herein involved are the owners of the respective lands immediately south thereof in Block D. It appears that prior to the genesis of this controversy there was no Block S & S, the land in such block supposedly having been contained as excess land in Block D. Although not clearly shown by the record the conclusion is warranted that some time in the early part of 1937 the Attorney General's Department of the State of Texas ruled that the land in Block S & S was not included as excess land in Block D but was vacant unsurveyed land belonging to the public free school fund of Texas. At any rate, a number of the various claimants and occupants of the lands in Block S & S employed the defendant Roy Sansing and W. H. Sewell, both attorneys of Lipscomb County, to secure an award or patent from the State of Texas for the land claimed respectively by such claimants. The fee to be charged was 50¢ per acre for the land awarded or patented, together with certain incidental expenses. Although some of the plaintiffs in this cause met with such attorneys and other claimants to talk over the matter none of them employed Sansing or Sewell, from whom Block S & S derived its name. Several trips to Austin were made by such attorneys to see the Attorney General and the State Land Commissioner to ascertain what might be done for the claimants and occupants of the alleged vacant land. From the testimony it appears that the Land Commissioner, who was then Honorable Wm. H. McDonald, agreed to sell the land to such original occupants at $1 per acre and in order to simplify the procedure advised that Sansing make application for the

occupants in his own name for the survey of the whole block.

On June 1, 1937 Sansing made application to Albertis Montgomery, Licensed Land Surveyor of Lipscomb County, to have the land in the block surveyed as unsurveyed school land with a view to purchase the same under the provisions of Section 6 of House Bill 358, Chapter 271, Acts 1931 of the Forty-Second Legislature, page 452. This Act existed from 1931 until amended by House Bill No. 9 of the Forty-Sixth Legislature in 1939, and may be found in its original form as article 5421c of the 1936 Centennial Edition of Vernon's Texas Statutes. It is now superseded by an article of the same number in the pocket parts of Vernon's Annotated Civil Statutes, which is the 1939 amendment. That portion of Section 6 of the 1931 Act pertinent here, and under which all the parties herein proceeded in their efforts to acquire an award or patent for the respective lands, is as follows: "Any one desiring to buy any of the unsurveyed land included in this Act not situated within five miles of a producing oil or gas well shall file with the county surveyor of the county in which the land may be situated, an application for survey describing the land in such manner as will enable the surveyor to identify it and pay the surveyor a fee of One Dollar ($1.00) for filing and recording said application and also deposit with him such sum of money as will pay for citing the claimant or claimants of the land, if any, and the adjoining owners as the tax rolls may disclose the names of such claimants or adjoining owners. The surveyor using the forms prescribed by the General Land Office, shall immediately send by registered mail or hand to each claimant or adjoining owner a citation containing a description of the land sought to be surveyed and fix a date for survey. The survey shall be made and the field notes filed in the Land Office within one hundred and twenty (120) days from the filing of the application with the surveyor. If the area is found by the Commissioner to be unsurveyed and subject to sale, he shall value the land and give notice of the valuation to the applicant who may purchase the land on the same terms and conditions as prescribed by the law and the regulations for the sale of surveyed land; provided, if the area should be in the enclosure of another person claiming it in good faith, or occupied as a home by another, such holder or occupant shall have a preference right for a period of sixty (60) days after service of citation to have the land surveyed on his own application to the surveyor and on the return of the sum advanced by the first applicant for citation, and thereupon fix his right to purchase as herein provided, * * *."

It was stipulated by the parties that there was no oil or gas production within five miles of any of the property involved herein.

The record shows that in June and July, 1937, the above surveyor, using the forms of the General Land Office, sent citations by registered mail to each of the plaintiffs herein, as required by the above-quoted portion of Section 6, notifying such claimants of Sansing's application to survey the whole block with a view to purchase and fixing the date for the survey. The record also shows, and the defendant admits, that within sixty days from the receipt of such citations each of the plaintiffs except Ed Schneider filed his own application with the same surveyor to have the respective land claimed by him surveyed for the purpose of purchase under the provisions of the 1931 Act. These applications, which were denominated "Applications for Survey to Purchase", were upon the forms prepared and furnished for such purpose by the General Land Office under the 1931 Act. Each such application of the plaintiffs, except Schneider, was filed and recorded first in the Surveyor's Office in Lipscomb County and later, before the expiration of sixty days from the receipt of the respective citations, filed in the State Land Office. After having surveyed the whole block for Sansing, the surveyor, acting upon the applications of the plaintiffs other than Schneider, also surveyed the individual tracts claimed by such occupants and filed the field notes thereof, together with the field notes of the survey under Sansing's application, in the State Land Office in less than 120 days from the date of the filing of Sansing's application for survey but more than 60 days from such date and from the date of the filing of the applications of the claimants.

The testimony shows that various awards were made by the Land Commissioner to those claimants and occupants of the alleged vacant strip represented by Sansing and Sewell, and these awards are not involved in this suit. Apparently upon the theory that he was not representing

the plaintiffs and was under no obligations to them, Sansing urged the Land Commissioner to award him the eleven tracts in controversy herein and five other tracts not here material. At any rate, on December, 6, 1938, the Land Commissioner, Honorable Wm. H. McDonald, sent Sansing a notice that his application and field notes covering 2343.03 acres of unsurveyed land had been examined and approved, the land,classified as mineral and grazing, valued at $1 per acre and offered to sell Sansing the land at such price with mineral reservations to the State as required by law. In such notice Sansing was informed that he would have 60 days under the law within which to file his application to purchase. No such notice was sent to any of the plaintiffs. Two days later, December 8, 1938, Sansing while in Austin made formal written application to the Commissioner to purchase the 2343.03 acres of land, exclusive of the mineral reservations to the State as required by law, which included the 1935.1 acres involved herein. In such application he offered to pay 1/40 of the purchase price, or $58.58, which accompanied the application, and the balance in 39 annual installments of equal amounts with interest at 5%. On the same day this application was filed in the Land Office, December 8, 1938, Land Commissioner McDonald awarded sixteen tracts of land in Block S & S, including the eleven tracts in controversy, to Roy Sansing in keeping with his formal application, the original claimants and occupants having had no notice of the award to Sansing, and yet, with the exception of Schneider all of the plaintiffs had theretofore filed under the 1931 Act their applications for survey to purchase together with the field notes made under their respective applications. The record as a whole warrants the conclusion that the applications of the plaintiffs other than Schneider were refused because the field notes made thereunder were not filed within 60 days from the service of citation upon plaintiffs by the surveyor, although it is admitted they were filed within 120 days from such dates. The Land Commissioner at such time seems to have interpreted the 1931 Act as requiring the original claimants and occupants to file such field notes within 60 days from the service of citation upon them in order to protect their preference rights to purchase, though the same statute unquestionably gave Sansing or anyone else 120 days from the filing of an application with the surveyor to file field notes in the Land Office.

As above indicated the trial court found all the land herein involved was vacant State school land at the time it was surveyed by Montgomery and that each of the plaintiffs except Schneider had thereafter perfected his preference right to purchase the land claimed by him. The court rendered judgment for each plaintiff except Schneider for the title and possession of the land claimed by him subject to the remainder of the purchase money indebtedness due thereon to the State of Texas as evidenced by the terms of the sale by the Land Commissioner to Roy Sansing. The judgment further provided that such decree should become effective if and when each of such plaintiffs had deposited in the registry of the court his proportionate share of the sum of money expended by Sansing in the cash payment for the land and of the statutory fees and charges in connection with Sansing's application and purchase from the State of Texas, such deposits to be made on or before 90 days after the judgment becomes final, otherwise the title to vest in the defendant Sansing. In other words, the judgment placed the plaintiffs other than Schneider in the defendant Sansing's shoes upon condition that they reimburse Sansing for the legitimate sums expended by him. So far as the Schneider tract is concerned the court found such land had been legally awarded to Sansing, that Schneider was not entitled to recover and decreed that Sansing recover the title and possession thereof with certain rentals from December 8, 1938 less a credit for certain improvements made by Schneider.

It is apparent from the foregoing that as between Schneider and Sansing the controlling issue is whether or not the land was vacant unsurveyed land prior to 1937, and as between .the other plaintiffs and Sansing whether or not the land was vacant, and, if so, which of them had prior rights in the land. The first question therefore to determine is whether or not there was a vacancy.

The true division line between the Panhandle of Texas and the Territories of the United States, now Oklahoma and New Mexico, is the 100th meridian of longitude west from Greenwich for the east line of the Panhandle, the 36½ degree parallel for the north line and the 103d meridian

for the west line. Originally the 100th meridian was located on the line of the inserted map marked by points "B", "C", "D" and "E", which line was the original eastern boundary of Lipscomb County and also of Blocks 10 and D. By a survey in 1928 and 1929 by United States Commissioner Samuel S. Gannett under the direction of the Supreme Court of the United States in the case of State of Oklahoma v. State of Texas, 272 U.S. 21, 47 S.Ct. 9, 71 L.Ed. 145, 148, the northeast corner of Texas was moved eastward as indicated on the map to point "A". See, also, Id., 281 U.S. 109, 694, 50 S.Ct. 247, 74 L.Ed. 731, 1122. This resulted, of course, by reason of the relocation on the ground of the 100th meridian. The division lines between Texas and the Territories were surveyed in 1859 and 1860 by Major John H. Clark for the Department of Interior of the United States in a survey made under and by virtue of legislative acts of the United States and the State of Texas. Article 2127 of Vol. II, Sayles' Early Laws of Texas; Chapter LXII of Vol. 3, Gammel's Laws of Texas, page 1525. The northeast corner of Texas as established by Clark in 1860 is presumably at point "C" on the map. This corner is about 14 varas south of the true 36°30' parallel or point "B" on the map, which parallel was relocated in 1933 by the Department of Interior in retracing Clark's earlier survey. In his report of his survey Clark describes 15 monuments which he placed at intervals on the 36°30' parallel from the northwest corner to the northeast corner of Texas. Monument No. 15 marked the northeast corner and was described as follows: "The northeast corner monument at the intersection of the parallel 36°30' and the 100th meridian. This is a mound of earth and falls in a drain of a ridge, but not in a position that is likely to be washed away". The testimony further warrants the conclusion that in 1880 or 1881 this same corner was further marked by a sandstone monument 12 or 14 inches square and 3 or 4 feet high by surveyors Chaney & Smith who were then marking Clark's line in establishing the Cimarron Base Line which was the south line of the townships of the Indian Territory. These surveyors also placed zinc pots and cones marking the mileposts along Clark's 36°30' parallel of the northern boundary of the Panhandle of Texas.

Block 10 immediately south of Block D was surveyed by J. H. Dinkins in 1873. He began his survey at the northeast corner of such block which he described as the 132nd mile post on the 100th meridian of longitude west from Greenwich and as marked by "a Monument 9 feet square and 6½ ft high made of Dirt & Stone The Dirt on Monument is covered with stone 1 foot thick From which a Cotton Wood 10 in in Dia brs N 62 E. 780 vs Ditto Double 10 & 8 in in dia brs N 72½ E. 131 vs. Large cropping stone on North Side of Branch marked H T C R R Co brs N 64 E. 60 vs." This point from such time until the present has been a well-established corner located on what was originally designated as the 100th meridian. This point was the 132nd mile post north from the Red River in such meridian line as originally established. It was not only the beginning point for this survey but also for Block D and is point "E" on the map. Moreover, it was from this point that the northeast corner of Lipscomb County was located in the creative act of the Legislature, as will hereinafter appear.

Lipscomb County was created in 1876 by an Act of the Fifteenth Legislature dividing Young and Bexar Territories into counties. Chapter CXLIV, Gammel's General Laws of Texas, Vol. 8, page 1070. In such Act the Legislature called for the beginning point as a monument on the intersection of the 100th meridian and the 36½ degree of latitude, 1629 feet north of the 132nd mile post on the 100th meridian; thence west 30 miles to the 30th mile post on the 36½ degree of latitude; thence south 30 miles and 1629 feet; thence east 30 miles to the 102nd mile post; thence north 30 miles and 1629 feet to the beginning.

In 1879 the Sixteenth Legislature passed an Act providing for the survey and sale of a portion of the unappropriated public lands of the State of Texas. Chapter LII, Vol. 9 of Gammel's Laws of Texas, page 80. In 1881 this Act was amended by the same Legislature. Chapter XXXIII, Vol. 9, Gammel's Laws of Texas, page 116. Each of these measures provided that such land should be sold in tracts of 640 acres each.

Block D was surveyed in 1882 by Will H. Bonnell presumably under the above 1879 Act of the Legislature and its 1881 amendment providing for the sale of unappropriated school lands of the State of Texas. In surveying Block D Bonnell began first with Survey 1 on the east end of the block, which he completed, and then

proceeded westward surveying each separate tract until the ten surveys of the block were completed. His field notes for Survey 1 were as follows: "Beginning at the NE corner of Sur No. 1 Block No 10 for the HT&B R R Co said Corner being a Mound of Earth and Stone 9 feet square and 6½ feet high the Mound of Earth is covered with Stone one foot thick from which a Cottonwood 10 in dia br N 62 E 780 vr ditto double 10 in dia br N 72½ E 132 vr a large Cropping Stone Mkd HTC R R Co on north side of bra br N 64 E 60 vr; Thence N 586 44/100 vr to the NE Cor of the Panhandle of Texas, the same being an old Mound of Earth at this time about 1 foot high and about 30 ft across; Thence W with the N B line of the State of Texas 6165 vrs to stake; Thence S 586 44/100 vr to stake in NB line of sur No. 4; Thence E 6165 vr to the beginning." It should be noted that Bonnell's description of his beginning point is almost identical with that of Dinkins in the latter's survey of Block 10.

It is conceded that Bonnell's first call for a distance of 586.44 varas in his field notes for Survey 1 of Block D would not take him to Clark's old northeast corner of Texas but only to point "D" on the map which is short of 36°30' parallel by 501.63 varas, the width of the east end of Block S & S. It is important to note that he made no reference to the sandstone monument erected by Chaney & Smith at Clark's northeast corner of Texas which had been placed there only a year or so before the Bonnell survey.

For Survey 2, immediately west of Survey 1, Bonnell began at the southwest corner of Survey 1. His field notes for this survey are as follows: "Beginning at the SW cor of Sur No 1 this Block, Thence West with the NB line of surveys Nos. 4 & 5 Blk 10 HT&B R R Co at 3335 vr the NW Cor of Sur No. 5 a Mound of Earth from which a tripple Cottonwood br S 28 W about 1 mile at 6165 vr a stake in the NB line of sur No. 7, said Block 10, Thence N 586 44/100 vr to a stake in the NB line of the State of Texas; Thence East with said NB line 6165 vr to NW cor of sur No. 1 this block; Thence S with the NB line of said sur No. 1 586 44/100 vr to the beginning."

It is significant that on the south line of Survey 2 the surveyor called for both artificial and natural objects, but for the north line, which he denominated the north boundary of Texas, he made no such calls. The field notes for Surveys 1 and 2 introduced in evidence were photostatic copies of the original field notes over the signature of Will H. Bonnell and are in this record as original exhibits. Similar original exhibits of the field notes of Surveys 3, 4, 5, 6 and 7 were also introduced in evidence. None were offered for Surveys 8, 9 and 10, but it seems from those introduced Bonnell was calling for the same distances each time north and south and east and west and for artificial and natural objects on the south lines of Block D, but none on the north. It is singular that he took no notice whatever of the remains, if any, of Clark's monuments on the 36°30' parallel or of the zinc pots and cones of Chaney & Smith which marked Clark's line only a year or so before Bonnell's survey.

■ The plaintiffs naturally contend that Bonnell's calls for adjoinder must be given controlling effect over his calls for course and distance, which construction would trace his footsteps to Clark's old northeast corner of Texas and to Clark's north boundary line of the Panhandle. This is the general rule in the absence of evidence showing "the call for adjoinder was made in mistaken belief as to the location of the adjoinder * * *". State v. Sullivan et al., 127 Tex. 525, 92 S.W.2d 228, 233. "In such situation", as said by Judge Smedley in the Sullivan case, "the call for adjoinder will be rejected, as inserted by mistake, and controlling effect given to course and distance from known and undisputed corners, when under the facts of the particular case such construction of the survey is 'most consistent with the intention to be derived from the entire description' ".

■ It seems that the latter rule is more applicable to the facts of this case. At the time Bonnell's survey was made the Legislature had just the year before passed a law the effect of which was to direct surveys of such lands to be made in 640 acre tracts. It is thus not insignificant that Bonnell's calls for course and distance in each of the ten surveys placed exactly 640 acres in such tracts while if calls for adjoinder should control Survey 1 would contain 1170 acres, an excess of about 90%, and the other surveys corresponding excesses decreasing in amount westward until No. 10, the smallest, would contain 440 acres in excess of the 640

called for by course and distance. Under the circumstances of this case this great amount of excess we think is important. While excess in quantity will be disregarded where the boundary of a survey can be otherwise ascertained with reasonable certainty, yet, in the absence of such ascertainment quantity may be looked to in determining the boundaries. Welder et al. v. State, Tex.Civ.App., 196 S.W. 868, writ refused.

It is also singular that Bonnell called for the same distance from the 132nd mile post as did the Legislature in the Act creating Lipscomb County. The Legislature placed the northeast corner of Lipscomb County, which is coincident with the northeast corner of the Panhandle, at a point 1629 feet north of the 132nd mile post, which is 586.44 varas, the distance called for by Bonnell. We think this is strongly persuasive that Bonnell was misled by the Legislature's apparent mistake in distance, thus stopping at a point 1629 feet north of the 132nd mile post where the Legislature had erroneously indicated the 100th meridian crossed the 36°30′ parallel. Weight is added to this conclusion by the fact that Bonnell made no reference to Chaney & Smith's sandstone monument at the alleged northeast corner of Texas and because he made no calls for any objects, natural or artificial, on the north lines to the west of the alleged northeast corner of Texas.

■■ In further support of the theory that Bonnell stopped short of Clark's north line of Texas are other discrepancies in his and Clark's description of the respective monuments at what each termed the northeast corner of Texas. Bonnell described his corner as an old mound of earth at that time about one foot high and about 30 feet across. He did not locate it in a "drain of a ridge" as did Clark nor did he designate it as Clark's monument. Clark did not state the size of his monument. He simply described it as "a mound of earth and falls in the drain of a ridge but not in a position that is likely to be washed away". Although Clark was bold enough to prophesy as to the resistance his mound would offer to erosion by water, for some unknown reason he neglected to hazard a prediction relative to wind and sand, and yet in the report of his survey he was free to cast chamber of commerce aspersions at this section of the country by describing it as an undulating prairie, sandy and destitute of water and all forms of vegetation

except grass and stated that in his survey to the south of the Panhandle .he passed over waterless sections of sandy deserts where the operations of the surveying party were "arrested by storms so violent as to turn over wagons, lift the instrument from the tripod, and fill the atmosphere with dust and gravel." He made the further observation that these "artificial monuments may be put up with great care of the most lasting material, yet the chances are that all traces of many of them will be swept away in a few seasons; for besides their destruction within the buffalo range, the wild Indians will certainly tear down all they meet with, particularly those made of stone, which will not give them so much trouble as the earthen mounds". All these circumstances, we think, cast some doubt upon the accuracy of Bonnell's adjoinder calls and at least present a question of fact as to the existence of the vacancy which has been resolved against the plaintiffs by the judgment and findings of the trial court, which finding of fact based upon sufficient testimony is binding upon this court. Stanolind Oil & Gas Co. et al. v. State, 129 Tex. 547, 101 S.W.2d 801; Blake et al. v. Pure Oil Co. et al., 128 Tex. 536, 100 S.W.2d 1009; Humble Oil & Refining Co. et al. v. State et al., Tex.Civ. App., 104 S.W.2d 174, writ refused; Caswell et al. v. Faulk et al., Tex.Civ.App., 97 S.W.2d 341, writ refused; Wilson v. Giraud, 111 Tex. 253, 231 S.W. 1074; Porter et al. v. State, Tex.Civ.App., 15 S.W.2d 191; Whittenburg et al. v. Jameson et al., Tex.Civ.App., 143 S.W.2d 668; 7 Tex.Jur. 168, par. 138 et seq., and authorities cited.

Having thus disposed of the boundary question it follows that Sansing must prevail over Schneider, whose sole defense was the nonexistence of a vacancy. Schneider made no pretense to perfect his preference rights to purchase the land under the provisions of the 1931 Act.

It now devolves upon us to determine the respective rights of Sansing and the other plaintiffs with reference to the other lands. In this connection Sansing contends that such plaintiffs failed to comply with the provisions of Section 6 of Chapter 271 in four particulars and thus did not perfect their preferential rights. These four alleged deficiencies are as follows: (1) that none of the plaintiffs had the land surveyed and field notes filed in the Land Office within 60 days after service of citation; (2) that none of the appellees returned the sum of money advanced by San-

sing for the citations; (3) that none of the land claimed by Henry Frass, Jr., as executor, Henry Frass, Jr., individually, Milton S. Bricka and Maggie Bricka was within the enclosure of any of the said parties or occupied by them as a home; and (4) that none of the land claimed by Henry Frass, Jr., as executor was claimed in good faith. All of these alleged deficiencies are based primarily upon that portion of Section 6 of the 1931 Act reading as follows: " * * * provided, if the area should be in the enclosure of another person claiming it in good faith, or occupied as a home by another, such holder or occupant shall have a preference right for a period of sixty (60) days after service of citation to have the land surveyed on his own application to the surveyor and on the return of the sum advanced by the first applicant for citation, and thereupon fix his right to purchase as herein provided * * *."

■ It is our opinion there is nothing in Section 6 which required the above-named occupants to have the land surveyed and field notes filed in the Land Office within 60 days after service of citation. The provision last quoted we think merely gave the occupant 60 days after service of citation to file his application with the surveyor to have the land surveyed. In other words the occupant was given 60 days to decide whether or not he wanted to have the land surveyed with a view of purchase or whether he would merely contest the title of the State as Schneider has done in this case, or whether he would allow the original applicant to become the purchaser without a contest. This seems to be the only reasonable construction to be placed upon the article, and the plaintiffs other than Schneider filed their applications with the surveyor within this 60 day period. We can see no reason why the occupant should be required to file field notes in the Land Office within a shorter period of time than required of the original applicant and we think such was not the intention of the Legislature. The Act plainly provides that such original applicant shall file his field notes within 120 days from the filing of his application with the surveyor. The plaintiffs other than Schneider complied with this provision which we think sufficient in this respect.

■ The second contention above is without merit because the court was warranted under the evidence to find that San-

sing had advanced no money to the surveyor for citations to the plaintiffs. Furthermore, the testimony reveals that Sansing did not pay the surveyor for anything done in connection with plaintiffs' applications but on the contrary the field notes which Sansing used in making his application were the field notes made for the plaintiffs and paid for by them. The trial court found that the plaintiffs other than Schneider had perfected their preference rights to purchase the land which presumptively included a finding that Sansing did not advance any expenses to the surveyor for the citations.

■ The third contention is based upon the fact that the land claimed by the Frass estate, that of Henry Frass, Jr., individually, and the two Bricka tracts were not enclosed by separate fences but merely attached to and operated as a ranching unit with other lands. No contention is made that such tracts were not within the fence surrounding the whole ranching unit. We think the statute did not require that each tract be entirely surrounded by a separate fence on all four sides as ostensibly contended by the defendant, but that, as here, it might be within a general enclosure with other tracts belonging to the claimant. Wintermann v. McDonald, Land Com'r, 129 Tex. 275, 102 S.W.2d 167.

■ The contention that the Frass estate land was not claimed in good faith was by reason of the fact that no taxes were paid upon the land in Survey 11 of Block S & S. The taxes were paid upon Survey 7 of Block D, the tract immediately south, but the rendition, assessment and payment was only for the 640 acres in Survey 7 of Block D, which excluded the purported excess land in Survey 11 of Block S & S. Upon all the other tracts in Block D the owners paid the taxes for the full acreage including the excess land north thereof now determined as vacancy in Block S & S. We think this contention of the defendant is untenable. The land in Survey 11 of Block S & S was paid for as excess acreage at the time of the purchase of the 640 acres in Survey 7 of Block D. Part of it was cultivated and the remainder used in the ranching unit. All of it was thus occupied by the original claimants. Under such conditions we think the failure to pay the taxes upon the full acreage would not be conclusive against the good faith claims of the occupants.

The defendant also challenges the judgment upon the theory that the plaintiffs did not possess such title as would support an action in trespass to try title, and asserts that inasmuch as plaintiffs did not possess such title, the instant suit, though filed within one year from the award, did not challenge the award to Sansing and therefore the plaintiffs' claims are defeated by the provisions of article 5329, Vernon's Annotated Civil Statutes, to the effect that "no sale made without condition of settlement shall be questioned by the State or any person after one year from the date of such sale". Similarly, because plaintiffs' trespass to try title suits allegedly did not constitute a challenge as to the existence of a vacancy the defendant asserts that the claims of plaintiffs are null and void under the provisions of the 1939 amendment to article 5421b, section 6(i) which declares any applications to purchase made under prior laws void unless there was pending a suit involving the question of vacancy at the time the 1939 amendment became effective, September 20, 1939, or unless the Commissioner granted such application within 9 months thereafter or unless the applicant should within 60 days after the end of such 9-month period file an action to litigate the question of vacancy. It is conceded that the plaintiffs' suits were filed within the time prescribed by both articles 5329 and 5421b. These contentions are not based upon the failure to file the suits within the times prescribed but upon the theory that the nature of the suits filed did not challenge the award to Sansing nor question the existence of the vacancy.

We are not in accord with this contention of the defendant. In so far as article 5329 is concerned the limitation therein expressed applies only to valid sales or awards which are either authorized by law or made under color of law. Callahan v. Giles, Com'r of General Land Office, et al., Tex.Sup., 155 S.W.2d 793; Caples v. Cole, 129 Tex. 370, 102 S.W.2d 173, 104 S.W.2d 3; Rainer et al. v. Durrill, Tex.Civ.App., 156 S.W. 589, writ refused. The limitation in that article will therefore not apply in this case unless some right or title passed to Sansing under his award, to which theory, except as to the land claimed by Schneider, we refuse to accede, as will hereinafter appear. However, irrespective of this conclusion, we still think the contention of the defendant relative to limitations under each of the statutes in question is without merit because in our judgment the suits filed by the plaintiffs constituted a sufficient challenge of the award and of the existence of the vacancy and, further, that the plaintiffs, other than Schneider, possessed such title as would support an action in trespass to try title.

All of the plaintiffs' pleadings and the defendant's responses thereto are substantially identical except for the description of the respective tracts of land. As material to this controversy and these issues the amended original petitions contained a trespass to try title count and a paragraph offering to do equity generally. The defendant answered by general demurrer, general denial, a plea of not guilty and specially pleaded his title derived through his application to purchase and the award from the Land Commissioner. Sansing then incorporated a cross-action which was in the form of trespass to try title with a count for damages. Plaintiffs then filed supplemental petitions containing a reply to defendant's answer and an answer to defendant's cross-action. This included a general demurrer, general denial, plea of estoppel and a plea of not guilty. Thus it will be seen that each party placed in issue the title by attacking the title of the other party by his action in trespass and by a plea of not guilty in response to the other's action in trespass. There were no allegations or facts requiring equitable relief by either side, that is, the parties did not appeal to the equitable powers of the court to compel the doing or undoing of any act or thing. The plaintiffs did not ask for the cancellation of the award to the defendant nor for any similar equitable relief. The award was merely attacked under their pleas of not guilty as being insufficient to vest title in Sansing. The issue thus joined was simply the superior rights of the parties in the land. That question was answered by ascertaining whose rights were paramount by virtue of the respective compliances with the provisions of Chapter 271. At the time the award was made to Sansing the Land Commissioner had before him upon the prepared forms furnished by his office the timely filed applications for survey to purchase of all the plaintiffs other than Schneider as original claimants and occupants of the respective lands. The lands were duly and timely surveyed upon such applications. As proof of such fact the Commissioner also had before him the timely filed

field notes supporting such application of all the plaintiffs other than Schneider. In addition to this in Causes Nos. 759, 760, 761, 762 and 765, formal applications to purchase the respective lands therein as mineral and grazing land at $1 per acre were filed by such plaintiffs prior to the notice of the award to Sansing and, of course, prior to the award. These were filed before the land was classified or valued by the Commissioner. In Causes Nos. 754, 755, 756 and 757, formal applications to purchase the lands therein involved as mineral and grazing land at $1 per acre were filed within 60 days after the date of the notice of the award to Sansing. These formal applications to purchase were filed in addition to the original applications for survey to purchase ostensibly for the purpose of making the position of such plaintiffs more secure, but we think such applications under this record were superfluous. Naturally no formal application to purchase could logically or effectively have been filed until the Land Commissioner had classified and valued the land, and after such was done the plaintiffs were afforded no opportunity to file formal applications to purchase based thereon since the land was awarded to Sansing two days after the date of his notice of the classification and valuation. Moreover, we think the timely filing first with the surveyor and later with the Land Commissioner of the applications for survey to purchase, together with the surveyor's field notes based thereon, constituted a sufficient compliance with Section 6 of the 1931 Act with reference to perfecting the preference rights of the original claimants other than Schneider, and thus placed upon the Land Commissioner the duty of affording such claimants an opportunity to file their formal applications to purchase their respective lands after the same had been classified and valued, which privilege was denied them. In this connection, in order to keep the record straight now and in the future, it should be stated that the defendant Sansing does not specifically challenge the applications for survey to purchase as not constituting formal applications to purchase the respective lands of the plaintiffs other than Schneider but impliedly admits their sufficiency in his reply brief wherein he states that the "undisputed evidence shows that all the plaintiffs, except the plaintiff Schneider, filed applications to purchase the land and such parties are claiming that in the event this court holds that the land was vacant, they have a preference right over the defendant Sansing to purchase the land."

We therefore conclude that under all the circumstances of this case the Land Commissioner, acting as the agent of the State by virtue of legislative enactment, was without authority to award any of the land to Sansing except that claimed by Schneider. The other plaintiffs had theretofore perfected preference rights to purchase under the 1931 Act by complying with all of its provisions. They had thus made an executory contract with the State of Texas for the purchase of the land under which they had acquired vested rights amounting to an equitable title in the land. White et al. v. Martin et al., 66 Tex. 340, 17 S.W. 727; Jumbo Cattle Co. v. Bacon et al., 79 Tex. 5, 14 S.W. 840; Wortham v. Walker, Commissioner of General Land Office et al., 133 Tex. 255, 128 S.W.2d 1138. Such equitable title under the law and facts of this case is superior to any title asserted by Sansing and as such we think sufficient to support their actions of trespass to try title and to defeat all claims of the defendant. Gilmore et al. v. O'Neil et al., 107 Tex. 18, 173 S.W. 203; Gulf Production Co. et al. v. Palmer et ux., Tex.Civ. App., 230 S.W. 1017, writ refused; Forman et al. v. Barron et al., Tex.Civ.App., 120 S.W.2d 827, writ refused; Barnes v. Williams, 102 Tex. 444, 119 S.W. 89; Barnes v. Patrick et al., 105 Tex. 146, 146 S.W. 154; Patrick v. Barnes, Tex.Civ. App., 163 S.W. 408, writ refused; Texas Law Review, Vol. XVII No. 4, page 518.

What we have said we think disposes of the controlling questions in this case. We must confess this opinion is not entirely in harmony with the recent efforts of the Judiciary and Bar of Texas to shorten opinions of the appellate courts, but the vice in this instance rests not with this court but is due to the voluminous record before us involving important questions in eleven distinct law suits each concerning a separate tract of land.

The judgment is affirmed.